NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

08-P-986                                                Appeals Court
13-P-1363


COMMONWEALTH <u>vs</u>. DAVID COUTU.


Nos. 08-P-986 & 13-P-1363.

Middlesex.      September 17, 2015. - December 8, 2015.

Present: Katzmann, Meade, & Rubin, JJ.


<u>Assault and Battery by Means of a Dangerous Weapon</u>. <u>Burning of Property</u>. <u>Attempt</u>. <u>Evidence</u>, Identification, Scientific test. <u>Practice, Criminal</u>, Failure to object, Identification of defendant in courtroom, Argument by prosecutor, Instructions to jury, New trial, Assistance of counsel, Collateral estoppel, Postconviction relief. <u>Collateral Estoppel</u>. <u>Deoxyribonucleic Acid</u>.




<u>Indictments</u> found and returned in the Superior Court Department on March 23 and August 15, 2006.

The cases were tried before <u>S. Jane Haggerty</u>, J., and motions for a new trial, for postconviction discovery, and for reconsideration, filed on April 26, 2012, June 7, 2012, and June 23, 2014, respectively, were heard by her.


<u>Amy M. Belger</u> for the defendant.
<u>Randall F. Maas & Bethany Stevens</u>, Assistant District Attorneys, for the Commonwealth.

MEADE, J. After a jury trial in 2007, the defendant was convicted of aggravated rape, home invasion, mayhem, assault and battery by means of a dangerous weapon causing serious bodily injury, armed robbery, kidnapping, and attempt to burn personal property. The events leading to these convictions occurred in 2006, when the defendant, a stranger to the victim, broke into her apartment by tunneling through the wall with a crowbar, and then beat and raped the victim with the crowbar before burning a box of items.

On appeal, the defendant claims the judge improperly permitted the victim to testify that she recognized the defendant by his "energy," the prosecutor's closing argument was improper, the judge erred in her jury instruction on identification, the evidence was insufficient to support the attempt to burn personal property conviction, the convictions of assault and battery by means of a dangerous weapon causing serious bodily injury and mayhem were duplicative, and the judge abused her discretion by denying the defendant's second motion for new trial based on a claim of ineffective assistance and newly discovered evidence. We reverse the convictions of assault and battery by means of a dangerous weapon causing serious bodily injury and of attempt to burn personal property, affirm the remaining judgments of conviction, and remand the

case for resentencing.  We affirm the order denying the second motion for new trial.

In a separate appeal, the Commonwealth claims error in the judge's order permitting postconviction DNA testing under G. L. c. 278A.  The Commonwealth claims that the judge misapplied the statute and failed to consider the strength of the Commonwealth's case, and that the defendant did not meet all the statutory criteria.  We affirm the judge's order.

1.  Background.  a.  Emergency response.  In the early morning hours of March 9, 2006, Ayer police and fire personnel responded to the victim's apartment.  The apartment was full of smoke, which emanated from an object smoldering in the bathtub that the fire fighters extinguished.  The fire fighters found the victim wrapped in a blanket and curled in the fetal position on the floor near the bathroom.  She had a head laceration that was bleeding profusely, bruises on her face, and a stab wound below her left eye.  There was a large amount of blood on the bed.  The victim was conscious, but in shock and crying.  She told those present that "[a] man came through the wall and raped me."  The victim was taken to the Nashoba Valley Medical Center and later airlifted to Beth Israel Deaconess Medical Center (BIDMC) in Boston.

b.  The attack.  The victim lived alone in the apartment. She worked as a "spirit medium" and assisted living people with

connection "to deceased loved ones." She also offered "spiritual counseling" and provided advice to those with problems. Her advice at times involved "divine guidance," which meant advice from "God's angels, spirit guides, [and] masters like Jesus and Buddha."

During the early morning hours on the day of the attack, the victim awoke to noises "coming through the wall." When the noises got closer, she got up and saw a man, later identified as the defendant, kneeling and opening drawers in a chest. The victim screamed and was "frozen in fear." She retrieved a crowbar she found on the floor, which she described as a "yellowy metal rusty thing," and attempted to defend herself. The defendant grabbed her hair, but the victim was unable to bring herself to hit him with the crowbar and instead pushed it under a nearby chest of drawers. The defendant threatened to hit her if she looked at him, and he asked the victim for money. As he continued to hold her hair, the victim crawled to her wallet and gave him forty-four dollars in cash. The defendant kept asking the victim if she had a boy friend; she did not respond.

Holding both of the victim's wrists with one hand, the defendant told her to take off her clothes. She said, "No, just let me go." She "was so frozen in fear, [she] didn't know what to do." The defendant took off his clothes and hers. He forced

her to "suck on his penis" and he threatened to hit her if she looked at him. He "sucked . . . on [her] vagina" and told her she was "beautiful." The defendant tied her legs to the bedposts with shredded pieces of her clothing and vaginally raped her with his penis. When the victim struggled to free herself, the defendant got off her and began to get dressed. He then covered her mouth and nose with his hand, which prevented her from breathing. She attempted to "peel his fingers off," but soon lost consciousness. The last thing she remembered was seeing the defendant raise the yellow crowbar over her and striking her on her head (more than once) and she "was completely out." The defendant beat and raped the victim with the crowbar.

When the victim regained consciousness, she saw a pool of blood next to her and she smelled smoke. The smoke was coming from a box the defendant had stuck in a hole in the wall. She dragged the flaming box into the bathtub and retrieved a fire extinguisher from the kitchen. After reading the instructions, she was able to use it to extinguish the fire. At some point, the victim's landlady came to the door and had her son telephone for an ambulance.

c. <u>The victim's injuries</u>. The extent of the victim's injuries were as extreme as they were extraordinary. The wounds to her head and face were so severe that she required plastic

surgery. Her perineum, i.e., her vagina and rectal areas, were "completely macerated"; the usually thick band of tissue between the vaginal canal and rectum was completely torn away. Her "normal anatomy could not be identified." Dr. Christopher Awetry, the victim's treating obstetrics and gynecological physician at BIDMC, opined that the victim's injuries were not caused by a knife, but instead by "an object that had tearing capabilities, but also with a blunt side." With a reasonable degree of medical certainty, Dr. Awetry opined that the victim's injuries were consistent with having been inflicted by a crowbar.

Part of the victim's treatment as a sexual assault victim was the administration of an AIDS preventative medication. However, the victim was allergic to the medication and developed a dermatological manifestation referred to as Stevens Johnson syndrome, which resulted in a chemical burn with swelling and blistering over ninety-eight percent of her body. These additional injuries were extremely painful and required her admission to the burn unit at Brigham and Women's Hospital.

d. The hole in the wall. The defendant gained entry to her apartment (no. 6) through a hole in the wall from a vacant, adjacent apartment (no. 7). The former tenants of apartment no. 7 had moved out, but some furniture remained in the apartment. The hole had been opened in the drywall between two studs. Paul

Zambella, a forensic scientist at the Massachusetts State police crime laboratory, measured the hole and found it to be approximately twelve and one-half inches wide by approximately twenty-one inches in length.

Daniel Freedman, the landlady's son and the building's maintenance man, was able to fit himself through the hole between the two apartments.  Freedman was approximately five feet, eight inches tall and weighed 185 pounds.  Detective Brian Gill, the lead investigator, made a cardboard replica of the hole with dimensions of twelve by eighteen inches based on his measurements.  Gill, who was five feet, eight inches tall and weighed 230 pounds, was able to fit through the replica of the hole.  In April of 2006, the defendant was six feet tall and weighed 190 pounds.  By the time of trial in the summer of 2007, the defendant appeared to have gained weight.

e.  Identifying the defendant as the assailant.  Eleanor Lamb, the defendant's sister, lived across the street from the defendant on West Street in Ayer in March of 2006.  On the night of March 8, 2006, some hours before the victim's attack in the early morning of March 9, Lamb was drinking and socializing in her apartment with Nicole Minkle, James Daniels, and Christopher Hird.  The defendant was present and drinking as well.  He left at approximately 10:30 P.M., but returned thirty minutes later.  When he returned, he told them the he had discovered a vacant

apartment with furniture left behind. The defendant asked if anyone wanted any of the furniture; all declined, except Lamb.

At approximately midnight, the defendant and Lamb left her apartment and walked for about two minutes before reaching the apartment building. They entered with a key the defendant found after he broke into the apartment through a window earlier in the evening. Lamb took a big role of bubble wrap, the defendant took a trash bag full of various items, and they both returned to Lamb's apartment.

Upon their return, the defendant asked to borrow Lamb's blue flashlight and a yellow crowbar that had previously belonged to Lamb's former boy friend. Hird also saw the defendant holding the yellow crowbar. On his way out the door, the defendant stopped and poked his head back in and said, "Don't worry, it's not like I'm going to hurt -- or kill anybody." He was dressed in blue jeans, a flannel shirt, and a dark-colored jacket. Lamb never saw the crowbar again after lending it to the defendant, but she did find the flashlight in her mailbox the next day.

The next morning, Lamb saw on the television news the apartment building she and the defendant had been in the previous evening. That evening, Lamb reported to the police that the defendant had been in the building with her the night

before the attack.[1]  She showed the police the route they took to the building and the door they entered.

After obtaining a search warrant for the defendant's apartment, the police found a yellow crowbar under his bed. After obtaining a second search warrant for the basement area of the defendant's apartment building, the police found a dark-colored jacket with chalky residue on it.  They also found a pair of blue jeans with white fragments and pieces of "wallboard or plaster" in the left rear pocket.  That same day, the police also recovered, from the area of the hole between apartments no. 6 and no. 7, a piece of wallboard debris with yellow-colored material on its surface.

f.  Forensic evidence.  Both the yellow crowbar and the blue jeans had human blood on them.  The blood on the blue jeans had a deoxyribonucleic acid (DNA) profile of at least two individuals.  The major female profile matched the victim, and the defendant was included as a potential contributor of the minor profile based on a probability of one in 41,000 for a randomly selected unrelated individual in the Caucasian population.  The yellow crowbar, which the police seized from under the defendant's bed, also had a DNA mixture of at least

---

[1] Lamb admitted that she initially lied to the police about being in the building herself, but then admitted accompanying the defendant inside.

two individuals; the defendant was excluded as a contributor, but the victim matched the major female profile.

A forensic review of the evidence revealed that the "two types of yellow paint found on the wallboard [between apartments no. 6 and no. 7] were consistent in color, microscopic appearance in spectrophotometric properties with the two shades of yellow paint on the [crowbar]."  Also, the wallboard between the apartments was consistent in "color, microscopic appearance, and instrumental properties" with the pieces of wallboard found in the back pocket of the blue jeans found the basement of the defendant's apartment building.

g.  The photographic array.  At the burn unit within Brigham and Women's Hospital, Detective Gill showed the victim a photographic array.  The victim appeared frail, was shaking, and cried throughout the interview.  When the detective showed her an array that contained the defendant's photograph, she excluded the defendant's photograph as her assailant.  When she viewed the photograph a second time, she said, "Definitely not this one."  At trial, the victim explained that she was very disoriented from the medications she was on at the time she was shown the photographs and, as a result, could not "pinpoint" anyone.

The victim described her attacker to the police as Caucasian with blonde or brown hair.  He was wearing pants, but

not blue jeans.  She said he was between five feet, six inches and five feet, nine inches in height, but probably five feet, eight inches or five feet, nine inches.  She added that he had a receding hairline, a medium to small build but with a fat frame, and "no jaw line, no chin."  The victim characterized him as a "coward from all angles" with a "cocky attitude."

2.  Discussion.  a.  Extrasensory recognition.  The defendant claims that the judge improperly permitted the victim to make an in-court identification of the defendant.  More specifically, the prosecutor asked the victim if she recognized her attacker in the court room.  The victim testified that she might recognize him if he were to stand.  With defense counsel's express permission, the judge ordered the defendant to stand.  The judge permitted the victim to leave the witness stand and to walk closer to the defendant.  As she faced him, she said, "Yes."  When the victim returned to the witness stand, the prosecutor asked her what she meant when she said, "Yes."  She replied, "That is the person.  I can recognize his energy because of my trade of work."  Despite the defendant's repeated claim on appeal that he objected to this testimony,[2] he made no objection and no motion to strike.

---

[2] On three occasions in the defendant's brief, appellate counsel states that this testimony was admitted over objection. These statements are directly contradicted by the transcript. Misrepresentation is neither advocacy nor ethical.  See

The defendant also claims that the matter was preserved based on statements counsel made to the judge during the charge conference regarding an identification instruction. During this discussion, counsel maintained that recognition by energy is not an identification. He did not belatedly object to the admission of the victim's testimony. Even if he had objected, it would have been untimely. We have a contemporaneous objection rule, not a retroactive objection rule. "'Order in the administration of criminal justice requires that if a defendant is aggrieved by what transpires during his trial,' he must assert a timely objection or claim of error." Commonwealth v. Pisa, 384 Mass. 362, 366 (1981), quoting from Commonwealth v. Stout, 356 Mass. 237, 243 (1969). See Mass.R.Crim.P. 22, 378 Mass. 892 (1979). Because the defendant's claim was not preserved, we review to determine whether an error occurred and, if so, whether that error created a substantial risk of a miscarriage of justice. See Commonwealth v. Freeman, 352 Mass. 556, 563-564 (1967).

To determine whether the evidence of the victim's recognition of the defendant by his "energy" created a substantial risk of a miscarriage of justice, and keeping in

---

Mass.R.Prof.C. 3.3(a)(1), 426 Mass. 1383 (1998) ("A lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal"). After the Commonwealth's brief brought these misrepresentations to our attention, appellate counsel corrected her misstatements in her reply brief.

mind that "[e]rrors of this magnitude are extraordinary events and relief is seldom granted," Commonwealth v. Randolph, 438 Mass. 290, 297 (2002), we ask four questions:  "(1) Was there error?  (2) Was the defendant prejudiced by the error?  (3) Considering the error in the context of the entire trial, would it be reasonable to conclude that the error materially influenced the verdict?  (4) May we infer from the record that counsel's failure to object or raise a claim of error at an earlier date was not a reasonable tactical decision?" (Citations omitted.)  Id. at 298.  "Only if the answer to all four questions is 'yes,' may we grant relief."  Ibid.  See Commonwealth v. Russell, 439 Mass. 340, 345 (2003).

The defendant claims that in light of Commonwealth v. Crayton, 470 Mass. 228 (2014), and Commonwealth v. Collins, 470 Mass. 255 (2014), the victim's energy recognition testimony requires his conviction be reversed.  We disagree.  In these cases, the Supreme Judicial Court held that "[w]here an eyewitness has not participated before trial in an identification procedure, we shall treat the in-court identification as an in-court showup, and shall admit it in evidence only where there is 'good reason' for its admission." Commonwealth v. Crayton, supra at 241.  The same rule applies where the eyewitness has not made an unequivocal positive identification of the defendant before trial.  See Commonwealth

v. Collins, supra at 265. However, even assuming the victim is an "eyewitness," the defendant fails to note that when the Supreme Judicial Court announced the above rules, it made them applicable only to trials that commenced after the issuance of those opinions, which occurred in December of 2014. The defendant was tried in 2007.

The defendant also claims the energy recognition evidence should have been excluded under Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Commonwealth v. Lanigan, 419 Mass. 15 (1994). If those principles applied in the circumstances of this case,[3] the defendant's argument might have had some force had he moved to exclude the evidence on these grounds, but he did not. Because this claim is being raised for the first time on appeal, it is waived. Newell v. Department of Mental Retardation, 446 Mass. 286, 298 n.27 (2006); Driscoll v. Providence Mut. Fire Ins. Co., 69 Mass. App. Ct. 341, 342 n.3 (2007). See Commonwealth v. Crouse, 447 Mass. 558, 570 n.11 (2006) ("To the extent that the defendant's claim rests on the judge's failure to assume the role of gatekeeper to preclude the introduction of 'junk science' evidence, it is too late for the defendant to request a Lanigan hearing").

---

[3] The Daubert/Lanigan standard is a mechanism designed to test the admissibility of scientific expert opinion, not testimony of a lay witness like the victim. See Commonwealth v. Lanigan, supra at 25.

Although we reject the above claims, the gravamen of the defendant's argument is that it was error to permit the victim, by employment of her "sixth sense" or through extra sensory perception (ESP), to recognize the defendant as her attacker. We agree.  "In general, a witness bases any identification [she] makes on [her] perception through the use of [her] senses. Usually the witness identifies an offender by the sense of sight -- but this is not necessarily so, and [she] may use other senses." Commonwealth v. Franklin, 465 Mass. 895, 910 n.24 (2013) (quotation omitted).  However, when our case law speaks of "other senses," it was meant to limit those available for identification to the five found in the natural world.  Indeed, by definition, ESP or a "sixth sense," is beyond the corporeal or numerical senses of convention.  The evidence of the victim's supernatural recognition of the defendant as her attacker should not have been permitted.[4]

Although we conclude there was error, when we consider the error in the context of the entire trial, it would not be

----

[4] At oral argument, appellate counsel likened the victim's energy recognition testimony to spectral evidence, which was used to convict the defendants at the Salem witch trials.  We disagree.  "Spectral evidence" refers to witness testimony that the accused person's spirit or spectral shape appeared to the witness.  See Hoffer, The Salem Witchcraft Trials, A Legal History 78-79 (1997); Starkey, The Devil in Massachusetts 54, 93 (1949).  Here, while the victim's energy recognition testimony was improper, it was not generated from an apparitional appearance she had of the defendant.

reasonable to conclude that the error materially influenced the verdict. See Commonwealth v. Randolph, 438 Mass. at 299-300. While the victim did not make a photographic identification, and discounted the actual photographs of the defendant, the Commonwealth offered compelling evidence that identified the defendant as the victim's assailant and rapist.

At trial, the Commonwealth's key witness was the defendant's sister, Eleanor Lamb, who was with the defendant on the night of the attack. Lamb joined the defendant and stole items from the vacant apartment (no.7) adjacent to the victim's apartment (no. 6). Lamb was the owner of the yellow crowbar that the defendant borrowed on the night of attack. Lamb later told the police of the events of the night. Two other witnesses, Christopher Hird and Nicole Minkle, corroborated Lamb's claim that the defendant told the group that he had found the vacant apartment with furniture in it. Hird also saw the yellow crowbar in the defendant's hand at Lamb's apartment.

The forensic evidence against the defendant was even more compelling. Police found a yellow crowbar matching the description given by Lamb and Hird under the defendant's bed. Forensic testing of the yellow crowbar revealed the presence of the victim's DNA. The paint on the crowbar was consistent with yellow marks left on the wallboard surrounding the hole between the two apartments. There was also evidence that two different

men (Daniel Freedman and Detective Brian Gill) of builds similar to that of the defendant were able to fit through the hole (or a replica of it) between the apartments.

Also, Lamb testified that on the night of the attack, the defendant was dressed in blue jeans, a flannel shirt, and a dark-colored jacket. In the defendant's basement, the police found blue jeans with wallboard fragments in one of the pockets. The blue jeans also had human blood on them. A forensic analysis of the blood stain showed that the blood contained a mixture of at least two individuals. The victim's DNA profile matched the major female contributor, and the defendant was included as a potential contributor of the minor profile.

Although the judge's decision on the Commonwealth's motion to reconsider the order on the defendant's second motion for new trial characterizes the victim's method of recognizing the defendant as "extremely powerful," she also determined that the other evidence against the defendant, cataloged above, "was very powerful, if not overwhelming." Moreover, during the trial, the judge indicated that the jury might completely disregard the victim's "energy" testimony or simply reject it as ridiculous. In any event, our determination whether the error materially

influenced the verdict is not contingent upon how the judge viewed the evidence.[5]

Finally, for the same reason that the judge concluded the jury may view the energy evidence as ridiculous, we can infer that counsel's not objecting to its admission was a tactical decision that was not manifestly unreasonable.[6]  Indeed, during counsel's cross-examination of the victim, he established that even though the victim could recognize the defendant's energy "imprint," she failed to recognize his photographs and said they were not her assailant.  Counsel could easily have concluded that the energy testimony seriously detracted from the victim's credibility, and he chose to leave it unchallenged and instead focused on her inability to make a photographic identification.  Because we do not answer all four of the Randolph inquires in the affirmative, the defendant has failed to establish that the error created a substantial risk that justice miscarried.  See Commonwealth v. Randolph, 438 Mass. at 298.  See also Commonwealth v. Dresser, 71 Mass. App. Ct. 454, 458 n.10 (2008)

_____

[5] For this same reason, there was no over-all effect to the judge's mistaken finding that the defendant was the only tenant who had access to the area where the blue jeans were found.

[6] The defendant admits this in his reply brief, where he states that "[n]ot highlighting such an off-the-wall part of the trial testimony by objecting to it when it occurred was not a manifestly unreasonable strategy at that moment."  Indeed, no claim is made by the defendant here that counsel's failure to object amounted to ineffective assistance of counsel.

(defendant's burden to establish existence of substantial risk of miscarriage of justice).

b.  The prosecutor's closing argument.  The defendant claims for the first time on appeal that the prosecutor vouched for the victim's energy identification in her closing argument. The challenged portion of the prosecutor's argument is as follows:

>"She certainly did say she wanted to study that face. No doubt she wanted to.  No doubt she wishes that she could tell you exactly what that person looked like in her bedroom, but she can't do that.

>"You think about the trauma that she went through, the physical pain, the injuries to her, the raping, everything. And again and again, 'Don't look at me. Don't look at me.' Good thing he said that, because she didn't get to look at him.  She didn't get to look at him.  And all she can tell you when she was in the courtroom whether she could identify him was his energy.

>"'That's the way I operate.  You people don't understand.'  That's him; that's his energy.  And you can give that whatever weight you deem necessary for that sixth sense of hers that she uses, saying, 'That's him; that's his energy.'  Well, you might remember one of her positive expressions:  I'm determined to move into my next perfect living space in New Hampshire by March seventh, 2006. Must.  She certainly got that energy right.  She just didn't get out in time.

>"March seventh, the day before this happens?  That's her energy there, and her energy was in here.  If you don't accept her identification of him through those senses, you don't have to.  You can put it aside.  You can disregard it, because you have enough evidence in this case to identify him as the perpetrator."

Contrary to the defendant's claim, the energy testimony was not the "cornerstone" of the Commonwealth's case.  The

prosecutor did note the victim's energy testimony, but also told the jury they did not have to credit that testimony because there was so much other evidence to identify the defendant as the perpetrator. This did not constitute improper vouching.

However, just as the evidence of an extrasensory identification should not have been admitted, this argument was improper. The Commonwealth should not have been urging jurors to give the victim's extrasensory energy recognition "whatever weight [they] deem necessary," or arguing that her ESP had a track record of reliability. Nonetheless, defense counsel did not object to this portion the prosecutor's closing argument. Again, we cannot say on this record that not objecting was a manifestly unreasonable tactical decision. In fact, there is no claim before us that it amounted to ineffective assistance of counsel. In all the facts and circumstances here, this error did not create a substantial risk of a miscarriage of justice. See Commonwealth v. Roderiques, 462 Mass. 415, 427 (2012) ("[O]ne factor to be considered in determining whether an error has created a substantial risk of a miscarriage of justice is whether defense counsel's failure to object was simply a reasonable tactical decision").

c. Identification instruction. The defendant claims that the judge erred in her jury instruction on identification by adding language to the standard instruction, which permitted the

jury to consider whether a witness had an adequate opportunity to "ascertain [the offender's] demeanor," and put a "judicial imprimatur of approval" on the victim's putative identification of the defendant. We disagree. At trial, the defendant objected, but on different grounds. The defendant objected based on his belief that this was an improper reference to the victim's energy testimony because he did not "know if ascertaining a demeanor is an identification." The defendant did not claim the instruction provided judicial approval of the victim's energy recognition testimony.[7] In any event, there was no error.

Our review of claimed jury instruction errors requires us to "evaluate the instruction as whole, looking for the interpretation a reasonable juror would place on the judge's words." Commonwealth v. Trapp, 423 Mass. 356, 361, cert. denied, 519 U.S. 1045 (1996). "We do not consider bits and pieces of the instruction in isolation." Commonwealth v. Young, 461 Mass. 198, 207 (2012).

The judge instructed as follows:

> "When evaluating a witness'[s] identification, you may consider many factors, including the circumstances

---

[7] At trial, the defendant sought the standard instruction on identification, even though the only identification of the defendant by the victim was her identification based on the defendant's "energy." No argument is raised here that the jury should not have been instructed on identification.

surrounding the encounter between the witness and the offender, and whether under those circumstances, the witness had an adequate opportunity to see the offender, to hear his voice, or to ascertain his demeanor."

The addition of the concluding phrase regarding demeanor was not prejudicial and, as the judge specifically noted at the charge conference, was "separate and apart from the [victim's] energy" reference.  Also, as the judge noted, the jury heard references to demeanor evidence when the victim told the police that her attacker had a "cocky attitude" and was "a coward from all angles."  These were references to the behavior of the attacker, not to his energy, and in no manner bolstered the victim's credibility.  When the judge's jury instructions are viewed as a whole, no reasonable juror could have improperly interpreted the references to demeanor as the defendant now suggests.

d.  New trial motions.  The defendant's first motion for new trial was denied in 2009.  In that motion, the defendant claimed he received ineffective assistance of trial counsel for a number of reasons, including counsel's failure to contest the defendant's ability to fit through the hole in the wall that led to the victim's apartment.[8]  In 2012, the defendant filed a second motion for new trial in which he claimed he was denied

_____

[8] The defendant filed a notice of appeal from the denial of his first motion for new trial, but he does not raise any claim related to it on appeal.

his right to a public trial,[9] and that he received ineffective assistance of trial and first appellate counsel based on their failure to establish that he could not fit through the hole in the wall or, in the alternative, that expert evidence of the hole's dimensions was newly discovered.  On appeal, the defendant claims that the motion judge, who was the also trial judge, abused her discretion by denying his second motion for new trial based on ineffective assistance.  We disagree for several reasons.

First, under the doctrine of direct estoppel, a defendant is barred from seeking review of claims "actually litigated" and decided against him.  Commonwealth v. Rodriguez, 443 Mass. 707, 710 (2005).  Here, the issue raised in the defendant's first motion for new trial, i.e., the claim of ineffective assistance related to the hole in the wall, was actually litigated and determined in that motion, it was an essential issue in the case, and the defendant had an opportunity to obtain review of the determination of his motion for new trial.  See ibid.  As such, direct estoppel operates as a bar to the defendant's attempt, in his second motion for a new trial, to relitigate his ineffective assistance claim.

---

[9] The defendant's closed court room claim is not before us on appeal.

Second, "[a] defendant seeking a new trial on the basis of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction." Commonwealth v. Pike, 431 Mass. 212, 218 (2000). "A defendant seeking a new trial on the ground of newly discovered evidence must first establish that the evidence was not discoverable at the time of trial despite the due diligence of the defendant or defense counsel." Commonwealth v. Sena, 441 Mass. 822, 830 (2004). Moreover, the defendant must establish that the evidence in question was "unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial . . . . The defendant has the burden of proving that reasonable pretrial diligence would not have uncovered the evidence." Commonwealth v. Grace, 397 Mass. 303, 306 (1986).

In his brief, the defendant claims that the judge ruled that the proffered expert testimony was, among other things, "newly discovered." The judge did not so rule.[10] Rather, the judge assumed for purposes of her resolution of the motion that the evidence was newly discovered. We need not, and do not, make the same assumption. The defendant has failed to demonstrate that reasonable pretrial diligence would not have uncovered the analyses in the expert's affidavits. There was no

---

[10] This misrepresentation was repeated in the defendant's reply brief.

showing that the technology used to measure the hole's dimensions and the defendant's chest did not exist at the time of trial. See Commonwealth v. Shuman, 445 Mass. 268, 275 (2005). Indeed, measuring is not on the vanguard of scientific techniques.

Third, even if the evidence were newly discovered, it was not an abuse of the judge's discretion to conclude that it did not cast real doubt on the justice of the defendant's convictions. See Commonwealth v. Grace, supra. Nor was it an abuse of discretion for the judge, employing the lens of Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), to have concluded that it would not have "accomplished something material for the defense." Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977).[11]

The expert's proffered measurements were contradictory as to the hole's narrowest point, and made the faulty assumption that the widest part of the defendant's chest would have to pass through the narrowest part of the hole. Also, the jury had heard testimony from two witnesses who were similar in weight to the defendant, but shorter, who were able to fit through the

---

[11] Also, contrary to the defendant's reply brief, the judge did not find counsel to be ineffective. Instead, the judge held that the first prong of Commonwealth v. Saferian, 366 Mass. at 96, had been met, but the defendant failed to establish prejudice under the second prong.

hole or through a replica of the hole constructed from its dimensions. Finally, when these facts are added to the overwhelming evidence of the defendant's identification as the attacker cataloged above in section 1.e, the denial of the motion was proper and not an abuse of discretion.

e. Attempt to burn personal property. The defendant claims his conviction of attempt to burn personal property, in violation of G. L. c. 266, § 5A, was not supported by sufficient evidence because the items in question were actually burned. We agree.

When evaluating sufficiency, the evidence must be viewed in the light most favorable to the Commonwealth with specific reference to the substantive elements of the offense. See Jackson v. Virginia, 443 U.S. 307, 324 n.16 (1979); Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979). In this case, to establish the defendant's guilt of attempting to burn personal property in violation of G. L. c. 266, § 5A, the Commonwealth was required to prove that (1) the defendant attempted to set fire to property, (2) the defendant did so wilfully, and (3) the defendant did so maliciously, i.e., with an unlawful motive and without excuse.

Relative to the attempt, the defendant claims that because he actually set fire to the box, it cannot be an attempt. We agree. In general, to prove an attempt under G. L. c. 274, § 6,

the elements are (1) the intent to commit the substantive crime, (2) an overt act in furtherance of commission of the substantive crime, and (3) nonachievement of the substantive crime -- that is, no actual completion of the substantive crime but, rather, an attempt ending before the substantive crime can be fulfilled. See Commonwealth v. Ortiz, 408 Mass. 463, 470 (1990); Commonwealth v. Bell, 455 Mass. 408, 412 (2009). Thus, under the general attempt statute, the completed substantive offense nullifies the existence of an attempt. Under G. L. c. 266, § 5A, the Legislature included a separate definition of what constituted an attempt under § 5A. It states:

> "The placing or distributing of any flammable, explosive or combustible material or substance or any device in or against any building, structure or property mentioned in the foregoing sections in an arrangement or preparation with intent eventually to wilfully and maliciously set fire to or burn such building, structure or property, or to procure the setting fire to or burning of the same shall, for the purposes of this section, constitute an attempt to burn such building, structure or property."

While this dedicated definition of attempt for purposes of arson relaxed the stricter common-law requirements set forth in Commonwealth v. Peaslee, 177 Mass. 267, 271-272 (1901), and Commonwealth v. Ali, 7 Mass. App. Ct. 120, 123 (1979), it did not expand the understanding of an attempt to be more than an inchoate crime. Because the evidence, even in the light most favorable to the Commonwealth, showed the box of items was

actually ablaze before the victim extinguished it, the defendant achieved the substantive crime and no actual attempt occurred.[12]

f. _Duplicative convictions_. The defendant claims his conviction of assault and battery by means of a dangerous weapon causing serious bodily injury is a lesser included offense of his conviction of mayhem (second theory). The Commonwealth concedes the issue, and we agree. See Commonwealth v. Forbes, 86 Mass. App. Ct. 197, 202-203 (2014).

3. _The Commonwealth's appeal_. The judge allowed the defendant's motion, pursuant to G. L. c. 278A, § 7, for postconviction DNA testing. On appeal, the Commonwealth claims the motion should have been denied. We affirm.

The Commonwealth claims the judge erred in concluding that the defendant was entitled to postconviction DNA testing under G. L. c. 278A, where there was no "reasonable potential" that testing would result in evidence material to the identification of the perpetrator of the crime. We disagree. Under G. L. c. 278A, § 7(b)(4), inserted by St. 2012, c. 38, "[t]he court shall allow the requested scientific or forensic analysis" where the defendant demonstrates by a preponderance of the evidence "that the requested analysis has the potential to result in evidence that is material to the moving party's identification

---

[12] Given the result we reach, we need not address the defendant's claim that the property at issue was not identified.

as the perpetrator of the crime in the underlying case."  "We review questions of statutory interpretation de novo." Commonwealth v. Wade, 467 Mass. 496, 501 (2014).  As the Supreme Judicial Court has held, "potential" within this framework is not reasonable potential:  "The Legislature's use of the word 'potential' in § 7(b)(4) suggests an awareness of the fact that the requested forensic analysis may not produce the desired evidence, but such a consequence should not be an impediment to analysis in the first instance."  Commonwealth v. Clark, 472 Mass. 120, 135-136 (2015).

Here, the defendant established that DNA testing of the victim's finger swabs has potential under G. L. c. 278A, § 7(b)(4), to result in material identification evidence. During trial, the victim recounted her efforts to "peel" and "pull" the defendant's fingers off her nose and mouth.  Even if it is "highly unlikely" that DNA testing will yield any probative results, the victim's testimony does suggest the potential that her assailant's DNA may have been on her hands and that the finger swabs could therefore produce material evidence.  See Commonwealth v. Clark, supra at 135 (request for DNA analysis "has the 'potential' to result in evidence" where victim testified that defendant's knife may contain his blood or skin cells after victim attempted to stab him).

The Commonwealth also asserts that the defendant fails to satisfy G. L. c. 278A, § 3(b)(5), which is required under § 7(b)(3), because a reasonably effective attorney would not have sought DNA analysis of the victim's finger swabs.  We disagree.

Under G. L. c. 278A, § 7(b)(3), the defendant must demonstrate by a preponderance that the evidence or biological material has not been subject to the analysis requested under G. L. c. 278A for one of five enumerated reasons stated in § 3(b)(5).  The defendant alleges that DNA testing did not occur in this case because his trial counsel failed to request testing and a "reasonably effective attorney would have sought [DNA] analysis."  G. L. c. 278A, § 3(b)(5)(iv).  For the purposes of G. L. c. 278A, the defendant must demonstrate that "'a' reasonably effective attorney would have sought the requested analysis, not that every reasonably effective attorney would have done so."  Commonwealth v. Wade, supra at 511.  In this instance, the defendant's trial counsel decided to forgo DNA analysis and instead pursued a different trial strategy.  Because G. L. c. 278A does not apply the Saferian ineffective assistance of counsel framework to evaluate whether an attorney is reasonably effective, the fact that trial counsel followed one trial strategy where another reasonably effective attorney

might have sought DNA testing is enough to satisfy § 3(b)(5)(iv).

Finally, the Commonwealth claims that we should consider the strength of its case in determining whether the defendant demonstrated the necessary G. L. c. 278A, § 7, factors by a preponderance of the evidence. We disagree. Despite the cost of a DNA analysis and the finite resources of the Commonwealth, "the Legislature intended to permit access to DNA testing 'regardless of the presence of overwhelming evidence of guilt in the underlying trial.'" Commonwealth v. Clark, supra at 136, quoting from Commonwealth v. Wade, supra at 511. As discussed above, the defendant has demonstrated that a reasonable attorney would have sought DNA analysis and that such analysis has the "potential" to result in evidence that is material to his identification as the perpetrator of the crime. Because the Legislature enacted G. L. c. 278A with the intent to remedy the wrongful convictions of factually innocent persons, we construe the statute and its language "in a manner that is generous to the moving party." Commonwealth v. Clark, supra. We therefore afford the defendant the opportunity for testing despite the strength of the Commonwealth's case, and our affirmance of his convictions.

4. Conclusion. The order denying the defendant's second motion for a new trial is affirmed. On the indictments charging

the defendant with assault and battery by means of a dangerous weapon causing serious bodily injury, and attempt to burn personal property, the judgments are reversed, the verdicts are set aside, and those indictments are to be dismissed.  The remaining judgments of conviction are affirmed, the sentences thereon are vacated, and the case is remanded for resentencing consistent with this opinion.  The order allowing the defendant's motion for postconviction DNA testing is affirmed.

<u>So ordered</u>.