NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

16-P-697                                              Appeals Court

COMMONWEALTH  vs.  ROBERT F. COOPER.

No. 16-P-697.

Middlesex.      March 8, 2017. - May 25, 2017.

Present:  Green, Wolohojian, & Sullivan, JJ.

Controlled Substances.  "School Zone" Statute.  Words,
    "Accredited."

Complaint received and sworn to in the Cambridge Division
of the District Court Department on March 29, 2012.

The case was tried before Michelle B. Hogan, J.


Kathleen A. Kelly for the defendant.
Jason R. Chandler, Assistant District Attorney, for the
Commonwealth.


GREEN, J.  Among the challenges to his conviction of

distribution of a class E substance in a school zone, in

violation of G. L. c. 94C, §§ 32D(a) and 32J, the defendant

contends that the evidence was insufficient to establish that

the pills seized at the time of his arrest were a class E

substance (gabapentin), or that the school furnishing the basis

for his school zone violation was an "accredited private preschool" within the meaning of § 32J.  We conclude that the evidence was sufficient to establish that the pills were a class E substance and, discerning no merit in his other claims of error as to that charge, affirm his conviction on the charge of distribution of a class E substance.  However, we reject the Commonwealth's contention that evidence that the preschool in question was licensed sufficed to establish that it was "accredited" within the meaning of the statute, and accordingly the defendant's conviction of the school zone violation is reversed, the verdict is set aside, and judgment shall enter for the defendant on that charge.

Background.  We summarize the facts the jury could have found, reserving other details for discussion of the issues.  On the morning of March 16, 2012, undercover Cambridge police Officer Janie Munro entered a fast food restaurant and made eye contact with the defendant; shortly thereafter, the two left the restaurant together.  Munro told the defendant that she was looking to buy drugs, and the defendant asked if she was familiar with "Johnnies," or Neurontins.  The defendant explained that the pills were really called gabapentin, and that he had a prescription for that medication, with five refills remaining.  During their conversation, the defendant displayed a prescription pill bottle from his backpack, though Munro was not

able to read the label.  As they ended their conversation, Munro and the defendant exchanged telephone numbers.  Later that day, the defendant sent Munro a text message, offering to sell her fifty "Johnnies" for forty dollars.  The two met again that day at a pizza restaurant in Cambridge, where the defendant advised Munro that he did not have the agreed-upon fifty pills but that he would sell her what he could.  Munro watched as the defendant removed yellow pills from a prescription bottle and placed them in a plastic bag.  The defendant then handed the pills to Munro underneath the table at which they were seated, and Munro handed him the agreed-upon payment in exchange.

Following the exchange, the defendant cautioned Munro to be careful when taking the pills, and not to consume more than five pills at once.  He further explained that the pills were 300 milligram, quick-release capsules.  During their conversation, Munro observed the defendant holding a prescription pill bottle, and saw the defendant's name on the label.  When Munro left the defendant and returned to the Cambridge police station, she counted thirty-two pills inside the bag she received from the defendant, each imprinted with "G5027."

The pills Munro purchased from the defendant were sent to the State police drug laboratory and examined by chemist Rebecca

Daner.[1]  Upon examination, Daner determined that the pills were all the same color, appearance, and size, and each bore the marking "G5027."  Based on her examination of the capsules, and after consulting reference materials maintained in the laboratory concerning the markings of prescription medications, Daner concluded that they contained gabapentin.

The pizza restaurant where the defendant sold the pills to Munro is located within 300 feet of the Bright Horizon Children's Center at University Park.  At trial, the center's director, Katie Coffin, testified that the center was licensed by the Department of Early Education and Care, as required for it to operate in Massachusetts, and a copy of the center's license was admitted in evidence.

Discussion.  1.  Sufficiency of the evidence -- class E substance.  In his challenge to the sufficiency of the evidence on his conviction of distribution of a class E substance, the defendant contends that the Commonwealth's evidence did not sufficiently establish that the substance the defendant sold to Munro was in fact a class E substance (gabapentin).  In

---

[1] Daner worked in the drug identification unit from May of 2011 to January of 2015, analyzing thousands of substances during her tenure.  Before joining the unit Daner earned a bachelor's degree in biology and a master's degree in biomedical forensic science.  During her time with the laboratory she received specialized training in drug identification, reviewed literature on drug analysis, completed practical exercises, and passed required competency exams.

particular, the defendant contends that the Commonwealth's failure to present evidence of a chemical analysis of the substance left the jury to speculate whether the substance was gabapentin, as the defendant represented it to be at the time he sold it to Munro, or was instead a counterfeit substance that the defendant falsely represented to be gabapentin.  See, e.g., Commonwealth v. Vasquez, 456 Mass. 350, 365-366 (2010), and cases cited.  See also G. L. c. 94C, § 32G (prohibiting possession with intent to distribute counterfeit substance).  We disagree.

When prosecuting a narcotics offense, the Commonwealth must prove that the substance in question "is a particular drug."  Commonwealth v. Paine, 86 Mass. App. Ct. 432, 434 (2014), quoting from Commonwealth v. MacDonald, 459 Mass. 148, 153 (2011).  "Proof that a substance is a particular drug need not be made by chemical analysis and may be made by circumstantial evidence."  Commonwealth v. Dawson, 399 Mass. 465, 467 (1987).  In cases involving pharmaceutical drugs, we have held that visual inspection supplemented by additional evidence probative of the identity of a drug may be sufficient to sustain the Commonwealth's burden of proof.  See, e.g., Commonwealth v. Alisha A., 56 Mass. App. Ct. 311, 313-315 (2002); Commonwealth v. Greco, 76 Mass. App. Ct. 296, 299 (2010).

6

In Alisha A., supra at 313, the evidence included a description of the color and shape of the pills, and of the presence of a hollowed out "K" in the middle of each tablet, and a physician testified that Klonopin pills are usually identified by a "K" marked on them. In addition, the juvenile had told her schoolmates that she would be bringing Klonopin pills into school to distribute; on the following day at school she displayed the pills and gave about fifteen of them to a schoolmate who, after ingesting them, was observed to be "under the influence." Id. at 312. On the same day the juvenile brought the pills to school, her mother (who had a prescription for Klonopin) noticed that she was missing seventeen pills. Ibid.

In Greco, supra at 297, there was evidence that the pills in question were yellow and stamped with the word "Seroquel," the brand name equivalent of the generic drug quetiapine. In addition, the defendant was observed in front of a Walgreens pharmacy, removing pills from a large prescription bottle and handing them to another individual. Ibid. When questioned, the defendant stated that the other individual had given him "ten bucks for the pills." Id. at 299. The bottle, which was introduced in evidence, bore the defendant's name and a "Walgreen's" logo. Ibid.

Similar to the facts in <u>Alisha A</u>. and <u>Greco</u>, the evidence in the present case included substantial circumstantial evidence in addition to the distinctive markings on the pills the defendant sold to Munro.  In particular, in his first meeting with Munro the defendant described the pills he intended to sell by both their street name ("Johnnies") and their pharmaceutical name (gabapentin).  He told Munro that he had a prescription for gabapentin, with five refills remaining.  When the two met for the sale, Munro saw the defendant remove the pills from a prescription bottle with his name on it.  In addition, on that occasion the defendant cautioned Munro to take no more than five pills at once, and advised her that the capsules were each 300 milligram, quick-release capsules.  That additional evidence distinguishes the present case from <u>Paine</u>, <u>supra</u> at 436, on which the defendant relies, but in which no evidence was presented regarding the nature of the drugs beyond the visual markings "consistent in markings and appearance with" a class E substance.  The evidence that the pills were a class E narcotic was sufficient to support the defendant's conviction.

2.  <u>Sufficiency of the evidence -- school zone</u>.  In his separate challenge to the sufficiency of the evidence to support his conviction of the school zone charge, the defendant acknowledges that the Commonwealth introduced evidence that the Bright Horizon Children's Center was licensed by the

Massachusetts Department of Early Education and Care, but observes that the statute applies only to private preschools that are "accredited."[2,3]  In response, the Commonwealth asserts that the term "accredited," as used in the statute, should be construed to include any private preschool that is licensed.

In general, "a statute is to be interpreted 'according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.'"  Commonwealth v. Welch, 444 Mass. 80, 85 (2005), quoting from Commonwealth v. Galvin, 388 Mass. 326, 328 (1983).  "We begin, of course, with 'the plain language of the statute,' but we also draw guidance from the legislative history of the statute [and] 'the language and construction of related statutes.'"  Commonwealth v. Jean-Pierre, 65 Mass. App. Ct. 162, 163 (2005), quoting from Welch, supra.  Where a term is not

---

[2] The defendant does not challenge the sufficiency of the evidence to establish that the sale occurred within 300 feet of the center, or that it occurred between the hours of 5:00 A.M. and midnight.

[3] Some schools and daycare facilities are licensed but never accredited for any number of reasons.  Although one may conceive valid policy grounds to include licensed educational facilities and day care centers under the umbrella of G. L. c. 94C, § 32J, we are bound by the language chosen by the Legislature.

defined, we may also "refer to definitions given the same word where it has appeared in other statutes under review."  Commonwealth v. Baker, 368 Mass. 58, 69 (1975).

Prior to 1998, G. L. c. 94C, § 32J, as inserted by St. 1989, c. 227, § 2, imposed a mandatory minimum sentence on "[a]ny person who violates the provisions of [certain specified drug statutes] while in or on, or within one thousand feet of the real property comprising a public or private elementary, vocational, or secondary school."  By St. 1998, c. 194, § 146, the statute was amended to add to the list of facilities triggering the statute's minimum penalties "a public or private accredited preschool" and an "accredited headstart facility."[4] By St. 2012, c. 192, § 30, effective August 2, 2012, the statute was again amended to reduce the distance from one thousand to 300 feet, and to restrict its scope to violations of the school zone provisions occurring between 5:00 A.M. and midnight.

The term "accredited" is not defined in G. L. c. 94C.[5]  As defined in Black's Law Dictionary (9th ed. 2009), "accredit"

_____

[4] In Commonwealth v. Thomas, 71 Mass. App. Ct. 323, 325 (2008), we construed the new language to include public preschools, whether or not accredited, based on the conclusion that the modifier "accredited," as applied to preschools, was applicable only to "those newly added facilities that were private in nature."

[5] We note that several other statutes that refer to accreditation without reference to licensure either provide a definition of accreditation or include a list of organizations

means "1.  To give official authorization or status to.  2.  To recognize (a school) as having sufficient academic standards to qualify graduates for higher education or for professional practice."  According to the same source, "license" means "1.  A permission, usu. revocable, to commit some act that would otherwise be unlawful . . .  2.  The certificate or document evidencing such permission."  Neither definition, standing alone, resolves the question whether the two terms are or should be considered equivalent for purposes of the school zone statute.  At trial in the present case, the Commonwealth presented no evidence concerning the availability or use of accreditation in the field of preschool or daycare facilities, so as to establish that accreditation is the substantial equivalent of licensure.[6]  We turn, then, to consideration of how the terms are used in other related statutory contexts.  See Baker, supra.  See also Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 523 (1986).

Our research has disclosed references to accreditation in a variety of other statutory settings, principally in the fields of education and health.  In several statutes, certification for

---

that can provide qualifying accreditation.  See, e.g., G. L. c. 18, § 28; G. L. c. 29, § 2JJ; G. L. c. 278A, § 8; G. L. c. 112, § 24G; and G. L. c. 112, § 54A.

[6] The record furnishes no guidance, for example, on the proportion of licensed preschools that are also accredited.

participation in a government program preempts or satisfies an otherwise applicable requirement for accreditation. In those instances, however, the relevant statute makes the equivalency between certification and accreditation explicit. See, e.g., G. L. c. 175, § 108 (contracts regarding accident and health insurance policies); G. L. c. 175, § 110 (contracts with insurers generally); G. L. c. 176A, § 5 (contracts with hospital service corporations); G. L. c. 176B, § 4 (contracts with a medical service corporation); G. L. c. 176G, § 6 (contracts with health maintenance organizations); G. L. c. 176I, § 2 (preferred provider arrangements). In certain other instances, a statute describing regulatory oversight of a field recognizes either a license or accreditation as alternative means to satisfy eligibility requirements under the statute. Again, however, in such instances the statutory equivalency is stated explicitly in the statute. See, e.g., G. L. c. 111, § 25N1/2 (primary care residency grant program); G. L. c. 152, § 28 (eligibility to employ a mentally retarded person under exemption for certain sheltered workspaces); G. L. c. 175, § 20A (credit for reinsurance); G. L. c. 176O, § 1 (defining health care professional).

We consider particularly instructive the treatment of licensure and accreditation, respectively, under G. L. c. 112,

§ 263, which governs the licensure and operation of private occupational schools.  Subsection (p) of that statute describes the manner in which private schools, having obtained a license, may become accredited.  It is clear from the statute that accreditation involves an additional review process, and a more stringent set of criteria, than licensing, and that not all licensed schools are accredited.

As we have observed, we construe the language used in a statute based on the meaning of the words used.  The Legislature is presumed to be aware of the meaning it has ascribed to terms it has used in other statutes, particularly in relation to similar subjects.  Accordingly, we must place some significance on the choice of the Legislature to use the term "accredited" rather than "licensed" in § 32J, and on the fact that it did not use both as alternatives (as it has in other settings).  We note as well that, prior to 1998, the statute did not refer to preschools at all and that, when it did, it encompassed only accredited private preschools (as compared to public schools, which are encompassed without regard to "accreditation").  See Commonwealth v. Thomas, 71 Mass. App. Ct. 323, 325 (2008).  On the record before us, the Commonwealth has developed no evidence suggesting that "accredited" and "licensed" are considered or treated as equivalents in any manner in the context of private preschools.  In the absence of such evidence,

and mindful of the principle of lenity applicable to the construction of criminal statutes, see Commonwealth v. Williamson, 462 Mass. 676, 679 (2012), we conclude that the evidence in the present case was insufficient to support the defendant's conviction of a violation of G. L. c. § 94C, § 32J.

3. Other issues. The defendant's remaining claims of error require only brief discussion. The defendant claims error in the denial of his motion to exclude the drug certificate and the testimony of chemist Rebecca Daner, filed after both sides rested. The motion was untimely and, accordingly, is waived. See Commonwealth v. Coutu, 88 Mass. App. Ct. 686, 692 (2015). In any event, the trial judge did not abuse her discretion in determining that Daner was qualified to offer an expert opinion, or to present a certificate expressing that opinion. Daner testified about her extensive training and experience, establishing her qualifications to offer an opinion based on the appearance and markings of the pills she examined that they were gabapentin. Cf. Alisha A., 56 Mass. App. Ct. at 313-315 (physician testified regarding appearance and distinctive markings of Klonopin). There was no abuse of discretion and, hence, no error; the admission of the evidence accordingly does not give rise to a substantial risk of a miscarriage of justice.

The defendant's related claim of ineffective assistance of counsel, based on trial counsel's failure to challenge Daner's

testimony and certificate in a timely manner, is likewise unavailing.[7]  As we have observed, however, the trial judge did not abuse her discretion in allowing Daner to testify to her opinion that the pills were gabapentin, based on her examination of their appearance and markings.  A timely objection to the testimony and certificate would have achieved nothing for the defendant, and counsel's failure to raise one accordingly furnishes no basis for a claim of ineffective assistance. See Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977); Commonwealth v. Conceicao, 388 Mass. 255, 264 (1983).

Conclusion.  The defendant's judgment of conviction on count 1, distribution of a class E substance, in violation of G. L. c. 94C, § 32D(a), is affirmed.  The defendant's judgment of conviction on count 2, distribution in a school zone, in violation of G. L. c. 94C, § 32J, is reversed, the verdict is set aside, and judgment shall enter for the defendant.

So ordered.

---

[7] We note that the defendant has raised his claim on direct appeal, so it is eligible for consideration and relief only if the "factual basis of the claim appears indisputably on the trial record."  Commonwealth v. Zinser, 446 Mass. 807, 811 (2006), quoting from Commonwealth v. Adamides, 37 Mass. App. Ct. 339, 344 (1994).